# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 28, 2010

## STATE OF TENNESSEE v. RICHARD DEAN NANCE

**Appeal from the Criminal Court for Washington County**
**No. 32583     Robert E. Cupp, Judge**

---

**No. E2009-01814-CCA-R3-CD - Filed June 8, 2010**

---

A Washington County jury convicted the defendant, Richard Dean Nance, of two counts of rape of a child and one count of incest. He appeals his convictions, arguing that the evidence was insufficient as a matter of law and that the trial court erred by permitting into evidence a prior conviction of one of his key witnesses. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and J.C. MCLIN, J., joined.

Brent Hensley, Greeneville, Tennessee (on appeal), and Joy Phillips, Assistant District Public Defender (at trial), for the appellant, Richard Dean Nance.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Joe Crumley, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves the defendant's anally raping and performing oral sex on B.L.,[1] his nephew. On May 3, 2006, a Washington County grand jury charged the defendant with four counts of rape of a child, four counts of aggravated sexual battery, and four counts of incest. At trial, the State proceeded only on two counts of rape of a child and one count of incest, and the remaining counts were dismissed. After a two-day trial, the jury convicted

---

[1]It is the policy of this court to only use the initials of minor victims of sexual abuse.

the defendant on all counts. On July 19, 2007, the trial court sentenced the defendant to 18 years' incarceration as a child rapist at 100 percent service for each count of rape of a child and ordered the sentences to be served consecutively to each other. The trial court also imposed a sentence of three years as a standard, Range I offender for the incest count to be served concurrently to the rape convictions for an overall effective sentence of 36 years. The defendant filed a timely motion for new trial and notice of appeal.

At trial, B.L., who was 12 years old at the time of trial, testified that in 2004 he lived with his mother. He explained that, when he was nine and 10 years old, he often stayed at the defendant's home "[s]o [the victim's] mom could go out and go to her aunt's." He explained that he would stay with the defendant "for a week and then for the weekend" and that his grandfather, Marvin Nance, also resided at the home. The victim explained that the home was a trailer-home with three bedrooms.

The victim said that sometime near Easter of 2004,[2] he was playing a video game located in the defendant's bedroom when the defendant entered the room. The victim testified that he was sitting up on the bed and that the defendant laid down on the bed and started taking off his clothes. He said that the defendant instructed him to lie down on his stomach and that the defendant removed the victim's pants and underwear. The victim testified that the defendant's penis touched his "bottom" and "[t]he thing you go to number two with." The victim testified that this action hurt him and that he "was a little mad." The victim said that he told the defendant to stop and that, after the defendant stopped, the victim saw the defendant's penis, which he described as "long."

The victim testified that "a short time after" the Easter incident but before his school's summer recess, the defendant placed his mouth on the victim's "thing." He said that the defendant placed the victim's penis in his mouth and "sucked" on it.

The victim testified that after these instances he would sleep inside a closet at the defendant's house because he feared the defendant. He stated that he moved a small mattress into the closet and used a string to keep the doors shut "[b]ecause [he] was afraid [the defendant] was going to get in and do something to [him]."

The victim stopped staying with the defendant, and he visited a doctor in the summer of 2004. He stated that he visited the doctor "[t]o get checked out to see if [the victim] was done anything to."

The victim explained that the investigation into his sexual abuse began

---

[2]Easter fell on April 11 in 2004.

because, when he lived with his mother, an incident occurred when his infant sister would not stop screaming. The victim stated that he "got [his] thing out and she sucked on it." One of his cousins observed this and told his mother. His mother determined that such behavior could be indicative of child abuse and involved the Department of Children's Services ("DCS") and the Greene County Sheriff's Department.[3]

On cross-examination, the victim stated that his cousins also stayed with the defendant during the times he stayed there. He testified that Marvin Nance, his grandfather, was not always at the home. He said, "He would stay gone cause sometimes he had to work, and then sometimes he went out with some friends." He said that he never told Mr. Nance about hiding the mattress in the closet.

The victim explained that he stayed in a spare bedroom and that the defendant often slept on a recliner in the living room. He also explained that the video game console was moved from the defendant's bedroom to the victim's room.

The victim could not specifically explain why he remembered the first incident occurring around Easter. He also did not know in what month Easter falls. The victim stated that after the Easter incident, he no longer wanted to go to the defendant's home. He said that despite his protestations, his mother sent him to the defendant's home for a weekend. He stated that the oral sex incident occurred during that visit and that he never returned to the home after that.

The victim could not recall telling DCS employee Susan Barnes that the defendant often entered his bedroom in the mornings. He admitted that he told Ms. Barnes that the defendant had children who died in an automobile accident. He also admitted telling Ms. Barnes and Lieutenant Jim Ellison of the Greene County Sheriff's Department that the defendant placed his penis in the victim's mouth.

On redirect-examination, the victim admitted he had difficulty with the dates of the incidents because he did not keep a diary. He also testified that he had not been in contact with his birth mother since Christmas Eve of 2006. He testified that his birth mother had made no attempt to speak with him.

Susan Barnes testified that she worked in Child Protective Services for the DCS in Greene County. She testified that, in managing the victim's case, she interviewed the victim several times and consulted counselors, law enforcement officers, and doctors.

---

[3]Although Greene County law enforcement personnel handled the case, the defendant's residence where the sexual abuse occurred was located in Washington County.

She stated that DCS first received the victim's case on June 27, 2005.

She referred the victim to Doctor Reardon in Greene County for a sexual abuse examination. She explained that DCS often sent suspected victims of child abuse to Doctor Reardon because he uses a colposcope. She explained that the colposcope "is something that they use as an instrument that kind of magnifies the genital area that lets the doctor get a better glance of if there's actually been any trauma or any kind of evidence to the child pertaining to the sex abuse." She testified that emergency room doctors generally do not use this instrument in examining a patient. Ms. Barnes testified that Doctor Reardon examined the victim on July 22, 2005, and that he found "no evidence of any kind of tearing or fissures." She explained that the examination occurred approximately a year after the alleged abuse.

Ms. Barnes interviewed the defendant on July 12 and 19, 2005. She said that the defendant initially denied any wrongdoing but eventually gave them information about the victim. She explained that her first interview with the defendant occurred at the DCS offices. The defendant said that the victim "had started this stuff again" and that the victim had concocted the allegations in retribution for the defendant's not taking him on a trip to Ohio. The defendant told Ms. Barnes that he suffered from a nervous condition. He also told her that the victim was a "very jealous child."

She again spoke with the defendant at the Greene County Sheriff's Department with Lieutenant Jim Ellison. She recalled that the defendant "started talking about that it was a mistake that he had let it happen with [the victim]." She stated that the defendant spoke of "mounting [the victim] from behind" and that he told her "that they kissed each other." She testified that the defendant admitted to having his penis touch the victim's "bottom" but that "he stopped at that point and went into the bathroom and locked the door."

Ms. Barnes stated that, during the interview, the defendant would stop talking for intervals of time. She said, "He put his head down, had his hands over his face, very hesitant at times to talk, told us that he couldn't remember a lot of things that had happened, if it did happen, he couldn't remember." The defendant told them that he suffered from blackouts and migraine headaches.

On cross-examination, Ms. Barnes admitted that, when she first received the victim's case, she had only been working with Child Protective Services for six months to a year. She also acknowledged that the victim was examined by a doctor in June 2004, one year before his case was handled by DCS. She admitted that she never visited the home where the victim was allegedly raped and that she never interviewed Marvin Nance.

Ms. Barnes admitted that the victim told her that he had not spoken with the defendant since January 2004. She also said that on July 5, 2005, the victim said, "[The defendant] used to suck my wiener, but he didn't make me do anything to him." Ms. Barnes testified that the victim also told her that the defendant pushed the victim's head into a pillow every morning. She admitted that during the interview the victim never told her about the anal rape incident that occurred around Easter.

Ms. Barnes explained that during a subsequent interview with the victim on July 25, 2005, in which Lieutenant Ellison was present, the victim stated that the defendant came into his bedroom while the victim was sleeping and anally raped him "for about ten minutes." He also never mentioned any instances of oral sex during this interview.

Ms. Barnes also stated that the defendant had told her that he suffered from multiple sclerosis. He told her that he had no children and that he had been divorced.

Lieutenant Ellison testified that he observed via closed-circuit television Captain Huffine's questioning the defendant on July 19, 2005, regarding the victim's allegations. The following statement was transcribed by Captain Huffine at 12:30 p.m. on July 19, 2005, and was read into evidence,

> Its [sic] been a year since [the victim] had stayed at my house. I decided that I wasn't going to be around my nephew [the victim] because I couldn't have any privacy when he was around. He would come into the bathroom when I was trying to use the bathroom, one time he came in while I was taking a shower and wanted to get in, he actually opened the shower door and jumped in he didn't have any clothes on. I pushed him back out. He also tried to get in the tub when I was bathing and I made him get out. [The victim] would come into my bedroom and get in the bed with me. If I wasn't asleep I would take him and put him on the couch. I have periods where I can't remember things after time has gone by. I don't recall doing what [the victim] said I did. I don't recall putting my penis on or in [the victim]. If I did – if it did happen I don't recall it.

Approximately ten minutes after this initial statement, Lieutenant Ellison and Mrs. Barnes interviewed the defendant again.

Lieutenant Ellison testified that he asked the defendant to deny or confirm the victim's allegations and that the defendant "basically put his head in his hands and would

keep his head down for long periods of time, and he would deny it." He said that the defendant would "say a few words and then he would stop for a period of time and just stare at the floor." Lieutenant Ellison said that the defendant eventually "started talking" and offered his statement into evidence,

> Over 1 year ago, I was living on Bowmantown Rd in Limestone my father was living with me. [The victim] and Aaron were staying with me. I tried to get [the victim] to sleep on the couch or spare bedroom. [The victim] constantly came into my bedroom and asked if he could sleep with me. I started dozing off and got woke up because he cuddled up to me. I made the mistake of ever letting it happen. We started talking and one thing led to the next, I had started to go to mount him from behind, when [the victim] was rubbing my arm that started to arouse me, and that's when I tried to mount him. We started rubbing each other and kissing. I believe we did rub each other's privates. [T]he kissing started out on the cheeks and then the lips then [the victim] asked me to roll over on my stomach and I did, he climbed up on my back. [H]e was moving like he was trying to get his thing in my butt. [The victim] then lay on his stomach, and I was going to do the same thing as he was doing to me. I got my penis to where it was touching [the victim's] bottom but I never penetrated him. I stopped and went into the bathroom and locked the door.

> I told [the victim] to go to the couch. . . .

> I told [the victim] that I was sorry that I let it happen, and he said it was okay.

The defendant signed this second statement.

On cross-examination, Lieutenant Ellison stated that he neither video- nor audio-recorded the interviews. He explained that the Greene County Sheriff's Department had a policy of not recording interviews. Lieutenant Ellison acknowledged that no information about oral sex surfaced during their interviews and that he had no information of such allegations at that time.

Before the defense presented it's proof, it moved to exclude from evidence Marvin Nance's prior conviction of aggravated sexual battery. The trial court denied the

-6-

motion and the defense elicited from Mr. Nance that he was currently serving a sentence for an aggravated sexual battery conviction. After this admission, the trial court gave an instruction to the jury to not consider Mr. Nance's conviction when determining the guilt of the defendant. Mr. Nance clarified that B.L. was not the victim in that case.[4]

Mr. Nance, the victim's grandfather and the defendant's father, testified that in early 2004 he lived with his son. He explained that he had a "light stroke" and was not employed during this time. He stated that he and the defendant had grown apart until they reacquainted at his mother's funeral in 2003. Mr. Nance said that the defendant lived in Ohio and "visited back and forth" until he moved in with him in January 2004.

Mr. Nance said, "Well, when [the victim] started coming over he'd stay maybe two or three weeks before he'd go home. [The defendant] would take him to school and pick him up . . . bring him back, fix his meals. Then sometimes [the victim] would go home and sometimes he wouldn't." Mr. Nance explained that he often left the home during the days to visit his daughters but would return by early afternoon. He said that he never spent a night away from home.

Mr. Nance testified that the victim usually slept on a fold-out sofa bed. He explained that, during the weekends his twin grandchildren stayed with them as well. Mr. Nance said that he would fold out the mattress and that the three children would sleep on it but that when just the victim was staying, he wouldn't unfold the bed. Mr. Nance stated that the victim never placed a small mattress in a closet and that he had no such mattress. He also maintained that the video game console was always in the living room and had never been moved to the bedrooms.

Mr. Nance explained that the victim "got mad at [the defendant] a lot because he thought he was the only one that [the defendant] was supposed to show any affection or spend time with because . . . his daddy never had nothing to do with him." He said that the defendant and the victim grew "real close" but that his twin grandchildren had also grown attached to the defendant. He explained that this caused the victim to become jealous. He testified that the defendant refused to take the victim on a trip to Ohio with him and that the victim became very angry with him. He said, "[T]hat's when all this mess started."

The defense also called Doctor Elizabeth Clemens, an emergency physician at Laughlin Hospital in Greeneville. The parties stipulated that she was an expert in internal medicine. She testified that she examined the victim on June 10, 2004, for possible sexual

---

[4]This clarification occurred at the request of the Assistant District Attorney General during cross-examination.

abuse.  She recalled that the victim showed no evidence of molestation.  The victim did not tell her that anybody had touched him "where there was a swimsuit" or asked him to keep a secret.  She said that the victim said that he had only kissed the defendant on the cheek.

Doctor Clemens examined the victim for bruises and found that any bruising on his body was consistent with the normal activity of a boy his age.  She testified that the genital examination showed no signs of abuse and the rectal examination was "totally normal."  She said, "There was no evidence of any kind of trauma."

On cross-examination, Doctor Clemens recalled that the victim was taken to the emergency room for suspected abuse because he had been misbehaving more than usual and had cut his sister's hair off.  She recalled the victim's mother speaking about the defendant, but she did not recall the conversation setting off any "alarms."

Doctor Clemens explained that she did not use an anoscope or colposcope to examine the victim.  She explained, "If it was a penis on a nine year old's anus and it had just occurred [within 24 to 36 hours], there should be tears or redness or some type of local trauma."  She agreed, however, that it is possible that the use of lubricants or other methods can minimize physical evidence of penetration.

Based on the evidence as summarized above, the jury convicted the defendant of two counts of rape of a child and one count of incest.  The defendant filed a timely motion for new trial and notice of appeal.

*Issues on Appeal*

The defendant attacks the sufficiency of the convicting evidence for his rape convictions.  He also argues that, even assuming that the evidence supported one child rape conviction, it failed to support two distinct verdicts for rape of a child.  The defendant also argues that the trial court erred in allowing Marvin Nance's prior conviction to be disclosed before the jury.

*I.  Sufficiency of the Evidence*

The defendant alleges that the evidence supports neither of his rape of a child convictions, and, in the alternative, he claims that the evidence only supports one conviction and not two "distinct guilty verdicts."

The standard by which we evaluate the sufficiency of the convicting evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e). Of critical importance in the present case, this court, in determining the sufficiency of the evidence, will not reweigh or reevaluate the evidence, *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), and questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not the appellate court, *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Also, this court may not substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522 (2003). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

The State's evidence specifically alleged two separate incidents of child rape: one involving anal rape and another involving oral sex. Upon reviewing the evidence in a light most favorable to the State, we hold that the evidence legally supports the jury's verdicts. Regarding the anal rape that occurred near Easter, the victim testified that the defendant put his penis where the victim "goes number two" and that it hurt him. The defendant told law enforcement and DCS personnel that he "mounted" the victim from behind. The defendant's brief places emphasis on the defendant's maintaining that his penis only touched the victim's "bottom" but never penetrated the victim. He also points to Doctor Clemens' testimony that the victim's anus showed no signs of penetration as contradictory to the victim's version of events. The jury, however, was free to believe the victim's testimony that the defendant's penis touched his anus and that it "hurt." Although Doctor Clemens did not find any signs of penetration around the victim's anus during her June 10, 2004 examination, we note that the examination occurred more than a month after the anal rape. Further, we note that any intrusion "however slight" qualifies as sexual penetration. With female victims, our supreme court has explained that, "[i]t is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)). Similarly, this court has held that proof of anal penetration is sufficient "even without evidence of full . . . intrusion of the victim's anal opening." *State*

*v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Nashville, Nov. 29, 2006). We have also deemed the evidence of penetration sufficient where the victim "testified that the defendant's penis had touched the inside of his 'butt' and that it was '[p]ainful.'" *State v. Ray Charles Gasaway*, No. 01C01-9703-CR-00101, slip op. at 4 (Tenn. Crim. App., Nashville, Mar. 24, 1998). Further, Doctor Clemens admitted that it was possible to achieve penetration without causing injury. The jury obviously chose to credit the victim's testimony and discredit the defendant's evidence to the contrary. The jury was within its purview in doing so, and we will not disturb its verdict of guilt for the anal rape of the victim.

The second count of rape of a child was wholly based on the victim's testimony that a short time after the Easter incident, the defendant performed fellatio on the victim. Once more, the jury accredited the victim's testimony that established all elements of rape of a child. We do not have the authority to reassess the credibility of the victim, and we uphold the conviction of this second incident of rape.

The defendant's brief also alleges that "without the establishment of some time frame for the offenses to have occurred it creates the possibility that double jeopardy has occurred." We disagree. As explained above, the evidence supported two counts of rape. Our supreme court has noted that "'although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense.'" *State v. Phillips*, 924 S.W.2d 662, 664 (Tenn. 1996) (quoting 75 C.J.S. Rape § 4 (1952 & Supp. 1995)). The court laid out the following factors in determining whether two separate sexual offenses occurred: (1) the nature of the act; (2) the area of the victim's body invaded by the sexually assaultive behavior; (3) the time elapsed between the discrete conduct; (4) the accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and (5) the cumulative punishment. *Id.* at 665. In the instant case the jury was presented with testimony that the defendant raped the victim once anally and once orally and that several days passed between the two encounters. Clearly, the jury could convict the defendant of two separate rapes without implicating constitutional double jeopardy provisions.

## II. Prior Conviction Evidence

The defendant further argues that the trial court erred in allowing the use of Marvin Nance's prior conviction for impeachment. He argues that the prejudicial effect of the conviction outweighed the probative value.

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609

authorizes the use of proof of a witness's prior convictions to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. *Id.* 609(a)(2). In the present case, when the witness to be impeached is not the accused, "a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice'" pursuant to Rule of Evidence 403. *Id.*, Advisory Comm'n Comments; *see* Tenn. R. Evid. 403. On appellate review, the trial court's rulings on the admissibility of prior convictions for impeachment purposes are subject to reversal only for abuse of discretion. *See, e.g., State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999).

The defendant argues that the introduction of Mr. Nance's conviction was prejudicial on two grounds. First he argues that the admission of the conviction was detrimental because Mr. Nance was the only witness to testify about the defendant's relationship with the victim and "the incidents that did and did not occur in the home." However, the trial court specifically held that the conviction was important in allowing the jury to determine Mr. Nance's credibility. Rule 609 explicitly allows for this type of impeachment, which is clearly probative of truthfulness.

The defendant also argues that the prior conviction, taken into account with the "close relationship of father/son between Marvin Nance and the defendant" and the men's living in the same home "was unfairly prejudicial and that the jury could associate or may easily believe that [the] defendant committed sexual abuse based upon the fact his father had." Mr. Nance had been convicted of aggravated sexual battery, *see* T.C.A. § 39-13-504, which is a lesser included offense of rape of a child. We acknowledge that some danger existed in presenting the jury with a conviction so similar to the defendant's charges, and we understand the defendant's fear that the jury might convict him based on the old adage: "Like father, like son." However, the trial court immediately cautioned the jury to not consider the Mr. Nance's conviction in determining the defendant's guilt. Further, we trust the jury's ability to separate Mr. Nance's criminal activity from that of the defendant. We cannot say that the trial court abused its discretion in cautiously allowing for the impeachment evidence.

*Conclusion*

The evidence is legally sufficient to support the defendant's convictions, and the trial court did not err in allowing the impeachment of Mr. Nance by prior conviction. In light of this analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE